693 So.2d 44 (1997)
ASPLUNDH TREE EXPERTS, INC., a foreign corporation, Appellant,
v.
Gerald MASON, Appellee.
No. 96-468.
District Court of Appeal of Florida, First District.
January 31, 1997.
Rehearing Denied May 8, 1997.
Marjorie M. Cain and Michael J. Thomas of Fuller, Johnson & Farrell, Tallahassee, for Appellant.
Thayer M. Marts, Marianna, for Appellee.
JOANOS, Judge.
This is an appeal from an order denying defendant/appellant's motion for a directed verdict. We reverse.
Appellee owned a herd of 56 buffalo which he had been cultivating for some thirteen years. He had bred some of them and acquired some from other sources. In the thirteen years he owned the buffalo, only two had died. One died giving birth to a calf, and another died of old age. Appellee and others testified that before July 1993, the buffalo were in excellent condition, however, the buffalo began dying, and within one year, the entire herd had died. After making some inquiries shortly after the initial deaths, appellee learned that appellant had sprayed herbicide on the utility right-of-way near his pastures a few days before the first deaths. Further investigation revealed that the buffalo may have died of malignant catarrhal fever.
Dr. Hawkins, a veterinarian who served as appellee's expert witness, testified that the herbicide overspray or drift line was well demarcated in the pasture, with wilted, yellowed grass. He took tissue samples from several of the dead buffalo, as well as samples of forage materials from the pasture and samples of the rumen, or stomach contents, of the dead buffalo. These samples were forwarded to Dr. D'Andrea of the Diagnostic Lab at Auburn University. The tissue samples revealed no significant concentrations of nitrates in the buffalos' systems. The results of testing the forage samples showed that the forage materials contained 190 parts per million ("PPM") of nitrates. Dr. Hawkins explained that when plants wilt, the nitrate concentration in the plant increases. Dr. Hawkins ultimately opined that the buffalo died because: "they were exposed to nonacute levels of nitrate in these plants that *45 were wilted and there was not a significant level to cause acute death, but there was a significant enough level to cause stress to occur to the animals, which lowers their immunity to fight off infection, which allowed this virus that causes malignant catarrhal fever to kill the animals." On that theory, appellee sued appellant for negligence in the application of herbicide in such a manner as to permit overspray or drift onto appellee's pastures.
Asked on cross-examination whether 190 PPM of nitrate was enough to cause immunosuppression, Dr. Hawkins responded that he did not know. In addition, on this question of whether 190 PPM was enough to cause immunosuppression, he deferred to Dr. D'Andrea, "if he is made aware of all the qualitative factors involved in this." Dr. Hawkins also indicated the literature was inconclusive as to whether stress was required to produce malignant catarrhal fever.
Dr. D'Andrea, a veterinary pathologist, who served as an expert witness for the defense, tested the tissue, rumen, and forage samples sent by Dr. Hawkins. He concurred in the diagnosis of probable malignant catarrhal fever, but said that 190 PPM of nitrate was not enough to cause stress if consumed by the buffalo.
The jury returned a verdict finding appellant 80% negligent and awarded damages in the amount of $153,500. Appellant contends that the jury verdict depended upon an impermissible stacking of inferences to prove causation. More particularly, appellant contends that appellee did not establish that any of the buffalo actually ate the wilted grass; appellee did not establish that the buffalo ingested nitrates in amounts sufficient to cause immunosuppression; and appellee did not establish how the buffalo acquired malignant catarrhal fever. Appellant relies on the rule against pyramiding of inferences in a circumstantial evidence case, and also on the rule that an expert's opinion does not constitute proof of the existence of facts necessary to support that opinion. See, e.g., Braddock v. School Board of Nassau County, 455 So.2d 394 (Fla. 1st DCA 1984). We agree that the proof of causation in this case was legally insufficient to support the jury verdict in appellee's favor.
In reviewing the trial court's grant or denial of a motion for directed verdict, this court "must evaluate the evidence in the light most favorable to the non-moving party, drawing every reasonable inference flowing from the evidence in the non-moving party's favor." Floyd v. Video Barn, Inc., 538 So.2d 1322 (Fla. 1st DCA 1989). The motion for directed verdict could only have been granted in this case if there was no evidence upon which the jury could find that the spraying of herbicide on the utility right of way led to the deaths of the buffalo. See generally White v. City of Waldo, 659 So.2d 707 (Fla. 1st DCA 1995); Jones v. Heil Co., 566 So.2d 565 (Fla. 1st DCA 1990). "[A] party who moves for a directed verdict admits for the purpose of testing the motion the facts in evidence and in addition admits every reasonable and proper conclusion based thereon which is favorable to the adverse party." Id.
In addition to the complete lack of evidence, in support of Dr. Hawkins' theory, that 190 PPM of nitrate was sufficient to cause immunosuppression, the evidence indicated there were other potential sources of stress on the buffalo that also could have caused immunosuppression. Dr. Purvis, also a veterinarian, with experience with buffalo herds in Florida, testified that ingesting poisonous plants can cause stress, as can parasites, to which buffalo are extremely susceptible. The evidence indicated there were some toxic plants growing in the buffalos' pasture. The buffalo began dying in the month of July when it was hot. Dr. D'Andrea indicated that stress can be caused by extremes in weather, loss of feed, or any sudden occurrence in the animals' routine. The evidence also indicated other potential sources of stress were pregnancy testing of the females and fighting among the males. And there was evidence that catarrhal fever can be carried by deer and rabbits. Viewing all the evidence in the light most favorable to appellee, we conclude it was speculative to conclude the drift of the herbicide appellant sprayed on the utility right of way led to the buffalos' deaths.
*46 We REVERSE the denial of appellant's motion for directed verdict.
WOLF and PADOVANO, JJ., concur.